THE CITY OF GALESBURG, Plaintiff-Appellant, *v.* THE ILLINOIS COMMERCE COMMISSION *et al.*, Defendants-Appellees.

Third District   No. 76-549

Opinion filed April 14, 1977.

Dennis Muncy, of Meyer, Capel, Hirschfield, Muncy, Jahn & Aldeen, of Champaign, for appellant.

William J. Scott, Attorney General, of Chicago (Hercules F. Bolos, Rodney C. Howard, and Mary C. Ubatuba, Assistant Attorneys General, of counsel), for appellee Illinois Commerce Commission.

William T. Hart, of Schiff, Hardin & Waite, of Chicago, for appellee Illinois Power Company.

Mr. JUSTICE ALLOY delivered the opinion of the court:

This is an appeal by plaintiff City of Galesburg from an order of the Circuit Court of Knox County affirming (on consolidated appeal from defendant Illinois Commerce Commission (Commission)) orders entered by the Commission in Docket No. 59733, a gas rate equalization

proceeding initiated by defendant Illinois Power Company (Illinois Power).

The City of Galesburg was granted leave to intervene in Docket No. 57933, and took appeals to the Circuit Court of Knox County from two orders of the Commission. The first appeal was taken from the Commission's order of August 19, 1975, refusing rehearing of an order entered by the Commission on July 9, 1975, which denied the City of Galesburg's request for discovery of certain information from defendant Illinois Power. The City of Galesburg also appealed from the Commission's order of March 24, 1976, which denied rehearing of the final, dispositional order in Docket No. 59733, entered by the Commission on February 11, 1976. That order mandated the graduated equalization of residential gas rates within Illinois Power's gas service territory. On September 9, 1976, the Circuit Court of Knox County affirmed the orders of the Commission.

The City of Galesburg appeals, raising issues involving (1) the scope and effect of section 38 of the Public Utilities Act (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 38), which forbids any unreasonable difference in rates charged or services provided by a public utility, but allows the Commission to authorize uniform class rates within Commission-determined regional units; (2) the scope and nature of issues properly considered in a hearing under section 36 of the Public Utilities Act (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 36), when the Commission suspends tariffs; (3) the sufficiency of the evidence to support the Commission's final order in Docket No. 59733; (4) the effect upon the proceedings in Docket No. 59733 of a finding (in a separate appeal) by the Circuit Court of Sangamon County, that certain portions of the Commission's order in Docket No. 58907 were invalid; and (5) the reasonableness of the Commission's order.

Illinois Power is a regulated electric and gas public utility providing service in areas of Illinois aggregating about 15,000 square miles. Gas service is provided by Illinois Power to over 350,000 customers located in 321 communities, including the City of Galesburg. Historically, Illinois Power has divided its gas service area into geographically separate supply areas, based on the interstate supplier of gas to each area. Prior to March 1961, Illinois Power provided gas service to five supply areas, designated Supply Areas A, B, C, D, and E, pursuant to rates which were separately applicable to each of the supply areas. In March 1961, Illinois Power withdrew rates filed for Supply Area D, due to the merger of two of Illinois Power's gas suppliers and the consequent combination of Supply Areas A and D. Since March 21, 1962, when the Commission authorized and directed Illinois Power to unify its operations in Supply Areas A and

C, the rates charged in Areas A and C have been identical except for a small differential in the cost of purchased gas adjustment applied to each supply area. As presently comprised, Supply Areas A and C are located primarily on the Illinois side of the St. Louis metropolitan area, and extend into Jackson, Jefferson, Marion, Fayette, Christian and Macoupin counties. Supply Area B consists of such cities as Galesburg, Jacksonville, Decatur, Champaign, Urbana, Danville and Monmouth. Supply Area E consists of a number of smaller towns in Knox, Mercer, Henry and Bureau counties.

On March 14, 1974, Illinois Power filed proposed revised tariff sheets with the Commission, the effect of which would increase electric rates 9.28% and gas rates 9.09%. Among other proposals, the tariffs would have applied a uniform cost of purchased gas adjustment to all service classifications, and eliminated from Illinois Power's rules, regulations and schedule of rates applying to gas service, all reference to supply areas. These changes would have the effect of equalizing gas rates among the existing supply areas serviced by Illinois Power. The Commission suspended these rate proposals in Docket No. 58907 and ordered hearings. Galesburg intervened and participated in Docket No. 58907.

Prior to the entry of a final order in Docket No. 58907, the Commission took action in Docket Nos. 58559 and 58582, gas curtailment proceedings brought by Illinois Power, in which, among other things, Illinois Power proposed the elimination of industrial interruptible gas service. Instead of eliminating that service, the Commission ordered Illinois Power to provide the service at substantially increased rates. The effect of revenues from this new rate (Rate 79) was then found to entirely offset Illinois Power's proposed residential rate increase in Docket No. 58907 (resulting in denial of the rate increase).

On February 13, 1975, the Commission entered its final order in Docket No. 58907. With respect to Illinois Power's proposal to equalize gas rates across supply areas, the Commission stated:

"Examination of IP Exhibit 5.8, and the testimony relating thereto, discloses the extent to which the Company has integrated its gas supply system. The integration of the Company's gas supply system enables Respondent to utilize incremental gas available in one supply area for purposes of necessity in another supply area. The integration of the Company's gas supply system will also enable Respondent to utilize its gas storage facilities, wherever located, for the benefit of all its customers.

The development of the Company's extensive underground gas storage facilities enables it to operate with a lower pipeline contract quantity and at a higher load factor with its gas suppliers. A lower overall cost of gas is one of the benefits and integration of

Respondent's system will pass this savings on to all of its customers in equal fashion. In addition, storage of gas available from suppliers in the summer months may be used by the Company in meeting the peak day requirements of its customers in any service area during the winter heating season.

To allocate the fair and reasonable proportion of the cost of a gas storage facility located in one area of the Company to another and different supply area, when all supply areas derive a benefit therefrom, would be a difficult task and result in discriminatory rates.

The City of Galesburg contended that the gas rates proposed by Respondent are preferential, discriminatory and inequitable to the municipalities, including the City of Galesburg, located in Supply Area B, in that customers located in Supply Area B are subjected to a higher increase in rates than are customers located in the remaining supply areas of the Company. At page 17 of the Brief of Intervenor City of Galesburg, filed November 18, 1974, in this case, its counsel stated as follows:

> 'Historically and until the present time, different rates have been charged by Illinois Power for the different supply areas. The important point is why have the rates been different. The answer is quite simple—the cost of service for one particular supply area is different from the cost of service for a different supply area requiring that different rates be charged. The rates that are presently in effect for the various supply areas are and must be presumed to be reflective of the cost of providing service in that particular supply area.'

The record in this case discloses that a new gas storage facility was placed into full operation in Supply Area B in 1974. The Company previously had constructed several gas storage facilities in its other supply areas. For several years, customers located in Supply Area B have had the benefits of the Respondent's gas storage capability without the allocation of any cost attributable to these storage structures to the cost of service for Supply Area B. Full operation of new Supply Area B storage reservoir is dependent upon gas being made available from other supply areas.

The integration of Respondent's gas supply system tends to create an integrated system or a 'regional unit' as provided by Section 38 of the Public Utilities Act, for which this Commission may 'prescribe uniform rates for consumers or patrons of the same class of service'. All classes of customers, with some exceptions, are being served under substantially similar conditions at a similar

respective cost to Respondent. The Commission is of the opinion that integration of Respondent's gas supply system is in the public interest.

The ability of Respondent to transfer available gas from any one of its service areas to another benefits all its customers and, in substantial part, is justification for common rates throughout all service areas of the Company. Respondent, by the tariff filing of March 15, 1974, proposes common rates for all classifications of service other than its general service classification, for which the Company proposed to reduce the existing differential in rates as between the various service areas."

The Commission concluded that:

"The evidence in the record is insufficient for this Commission to properly determine the effect of applying uniform gas rates to all residential customers throughout the Respondent's four service areas. The Commission is of the opinion that Respondent should be required to make such studies as are necessary to demonstrate the effect on its customers of providing common rates for residential service throughout its total service area and within 30 days of the date of this Order present a plan to implement such common rates, giving due consideration to the severity of the required rate changes on individual classes of customers located within its various service areas. In developing its plan, Respondent should maintain aggregate revenues obtained from residential customers, at the level provided by rates currently in effect, adjusting lower rates upward and higher rates downward."

The commission then ordered Illinois Power to submit a plan to implement common residential gas rates within its entire service area.

Galesburg did not petition for rehearing or otherwise appeal from the Commission's order in Docket No. 58907. However, certain industrial electric customers petitioned for rehearing of such portion of the Commission's order in Docket No. 58907 as transferred a part of the proposed residential electric increase, to industrial electric increases. In a subsequent appeal to the Circuit Court of Sangamon County, Airco Industrial Gases v. Illinois Commerce Commission, No. 220-75, that court found on December 10, 1976, that two findings within the Commission's order in Docket No. 58907, relating to the proposed electric rate increases, were not supported by the evidence recited in the Commission's order, and remanded the order to the Commission for additional proceedings and further findings on those issues. An appeal from the order of the Circuit Court of Sangamon County is now pending before the Fourth District in the Illinois Appellate Court.

On March 14, 1975, Illinois Power filed a proposed plan to achieve

common residential and general service rates throughout its territory. The equalization of residential gas rates required the following changes in revenue from each of Illinois Power's supply areas: a decrease of 8.72% for Supply Area A, an increase of 18.78% for Supply Area B, decrease of 12.48% for Supply Area C, and an increase of 15.76% for Supply Area E. Illinois Power's plan proposed leveling the rates in two nearly equal stages over a 12-month period. On April 9, 1975, the Commission in Docket No. 59733 suspended the proposed revision pursuant to section 36 of the Public Utilities Act, and ordered a hearing to be held concerning the propriety of the proposed rates. On April 23, 1975, the Commission denied a motion by Illinois Power that the rates be allowed to become effective without suspension, but directed that the hearing on the plan "be limited to the just and reasonable nature of the plan and the proposed new gas rate schedules." On April 30, 1975, the Commission granted Galesburg leave to intervene in Docket No. 59733. Thereafter, public hearings were held in which Galesburg and other intervenors participated. Based on the Commission's limitation of issues, Galesburg's request for discovery of service data and information relating to Illinois Power's revenues was denied by the hearing examiner and the Commission. Prior to the conclusion of the hearings, Galesburg appealed these rulings to the Circuit Court of Knox County.

The Commission entered its order in Docket No. 59733 on February 11, 1975. Therein, the Commission stated:

"Pursuant to that order [Docket No. 58907], the Company filed on March 14, 1975 its proposed plan to achieve common gas rates for residential service, together with revised tariff sheets designed to implement the first phase of that plan. Because the Commission determined in Docket 58907 that the Company's system was sufficiently integrated to require common gas rates, this proceeding is limited to the reasonableness of the Company's proposed plan and the tariff sheets filed to implement that plan."

The Commission concluded that the residential rates which were then in excess of the final uniform rate should be reduced immediately to the final level, and that the residential rates then lower than the final uniform rate should be increased in three equal steps, on March 1, 1976, September 1, 1976, and March 1, 1977. Since this method of adjustment would cause a revenue loss to Illinois Power, the Commission authorized Illinois Power to utilize excess Rate 79 revenue to offset the temporary loss of revenue. On March 24, 1976, the Commission denied Galesburg's petition for rehearing of the order in Docket No. 59733. Galesburg did not request the Commission to stay its order pending appeal and review. Subsequently, Galesburg appealed the final order in Docket No. 59733 to the Circuit Court of Knox County.

Galesburg's appeals from the order denying discovery and from the final order in Docket No. 59733, were consolidated for review in the Circuit Court of Knox County. In those proceedings, Galesburg moved for a stay of the Commission's order pending review. After conducting a hearing, the court denied the motion for a stay, finding that Galesburg had not shown the requisite great or irreparable damage. After further proceedings, the circuit court found that the Commission had determined in Docket No. 58907 that Illinois Power's service areas constituted an integrated regional unit; that the Commission's findings in Docket No. 58907 were not then presented to the court for review; and that the Commission did not abuse its discretion in denying Galesburg's informational requests. The court affirmed the orders entered by the Commission in Docket No. 59733.

Galesburg now appeals from the order of the circuit court affirming the Commission's orders in Docket No. 59733. On January 19, 1977, Galesburg also filed in this Court a motion to stay the Commission's order pending review, pursuant to section 71 of the Public Utilities Act (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 75), and the Commission and Illinois Power, on February 8, 1977, filed an answer to Galesburg's motion. On February 16, 1977 we entered an order taking the motion for stay with the case for consideration, and additionally, expedited this appeal. Section 71 of the Public Utilities Act, which authorizes this court in its discretion to suspend an order of the Commission pending review of that order, provides in part:

"* * * if the * * * order * * * of the Commission is suspended, the order suspending the same shall contain a specific finding based upon evidence submitted to the court, and identified by reference thereto, that great or irreparable damage would otherwise result to the petitioner, and specifying the nature of the damage."

Galesburg's motion to stay, as filed in this court, addresses the merits of its arguments on this appeal, but does not argue the quantitative or qualitative nature of the harm which would result if a stay were not granted. In view of our decision in this case, Galesburg's motion for a stay is denied.

■■ On this appeal Galesburg raises issues concerning the burden of proof required to support an order of the Commission leveling utility rates for all customers within a given class of service. Section 38 of the Public Utilities Act provides in part:

"The Commission, in order to expedite the determination of rate questions, or to avoid unnecessary and unreasonable expense, or to avoid unjust or unreasonable discrimination between classes of customers, or, whenever in the judgment of the Commission public interest so requires, may * * * for rate making and

accounting purposes, or either of them, consider one or more municipalities either with or without the adjacent or intervening rural territory as a regional unit where the same public utility serves such region under substantially similar conditions, and may within such region prescribe uniform rates for consumers or patrons of the same class."

The Commission's order in Docket No. 59807 concluded that Illinois Power's gas supply system was so integrated as to create a regional unit under section 38; that with some exceptions, all classes of Illinois Power customers were being served under substantially similar conditions at similar costs to Illinois Power, and that integration of the Illinois Power supply system was in the public interest. While the Commission did in Docket No. 58907 mandate the equalization of gas rates within the Illinois Power supply area, the Commission there concluded that, due to insufficient evidence of the effect of uniform gas rates upon consumers, implementation of the common rates should await the study of the impact of the new rates upon customers. It thus appears that the decision to implement common gas rates was made by the Commission in Docket No. 58907, subject only to the determination of a graduated plan to implement the new rates. However, Galesburg, while participating in Docket No. 58907, did not appeal from the Commission's order in that proceeding. Section 68 of the Public Utilities Act (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 72) provides in relevant part:

> "*When no appeal is taken* from a rule, regulation, order or decision of the Commission, as herein provided, *parties* affected by such rule, regulation, order or decision, *shall be deemed to have waived* the right to have the merits of said controversy reviewed by a court and *there shall be no trial of the merits of any controversy in which such rule, regulation, order or decision was made, by any court to which application may be made for a writ to enforce the same, or in any other judicial proceedings.*" (Emphasis added.)

The Illinois Appellate Court, in *Colton v. Commonwealth Edison Co.* (1st Dist. 1953), 349 Ill. App. 490, 498-499, 111 N.E.2d 363, stated:

> "The [Public] Utilities Act provides a method of review of commission action, and in seeking such review statutory procedure must be followed (*Alton Railroad Co. v. Commerce Commission*, 407 Ill. 202; *People v. Biggs*, 402 Ill. 401); and where the commission had jurisdiction over the parties and the subject matter, as it did in the instant case, alleged defects in commission procedure such as the lack of proper hearing cannot be attacked collaterally but must be attacked on direct review in manner provided by the Act (*Illini Coach Co. v. Commerce Commission*,

408 Ill. 104; *Chicago North Shore and Milwaukee Railroad Co. v. City of Chicago*, 331 Ill. 360)."

Since Galesburg did not appeal from the Commission's order in Docket No. 58907, it is clear that Galesburg may not now collaterally attack the Commission's finding therein, that Illinois Power's service area constituted a regional unit for which uniform gas rates should be applied, and further that this court now lacks the power to determine the merits of Galesburg's arguments as concern the Commission's findings in that proceeding. Nonetheless, we note that the Commission's findings in Docket 58907, that Illinois Power's supply system constituted an integrated, regional unit, serving customers under substantially similar conditions at similar costs to Illinois Power; that the construction by Illinois Power of gas storage facilities resulted in benefit to customers of all then-existing supply areas; and that allocation of the cost of gas storage facilities among the supply areas would be a difficult task and result in discriminatory rates, were findings which are not clearly "against the manifest weight of the evidence presented to * * * the Commission" in Docket No. 58907 (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 72).

■■■ Galesburg additionally argues that the Commission erred in limiting the issues in Docket No. 59733 to consideration of the severity of the impact of the rate increase on customers. The objective of the plan proposed by Illinois Power on March 14, 1975, was to achieve uniform gas rates while maintaining the aggregate revenues obtained by Illinois Power from gas service. Thus when the Commission suspended the proposed rates under section 36 of the Public Utilities Act, it specified that the issues to be considered upon hearing "be limited to the just and reasonable nature of the plan and the proposed new gas rate schedules." Galesburg argues that in Docket No. 59733, Illinois Power should have been required to establish the present values and rate of return upon its investment, to justify the proposed rate structure. Section 36 of the Public Utilities Act provides in part:

"Whenever there shall be filed with the Commission any schedule stating an individual or joint rate * * *, the Commission shall have power * * * to enter upon a hearing concerning the propriety of such rate * * *, and pending the hearing and decision thereon, such rate * * * shall not go into effect."

It is clear that under this provision the Commission's decision to suspend a proposed rate and hold a hearing, is discretionary and need not be based upon a finding that the proposed rate is reasonable. (*Antioch Milling Co. v. Public Service Co.* (1954), 4 Ill. 2d 200, 123 N.E.2d 302; *City of Chicago v. Illinois Commerce Com.* (1958), 13 Ill. 2d 607, 150 N.E.2d 776.) With respect to the justification of rate structure, the Illinois Supreme Court stated in *Antioch* (4 Ill. 2d 200, 209-10):

"* * * Section 30 of the [Public Utilities] act provides, 'In all proceedings before the Commission, initiated by the Commission upon its own motion, or initiated by an application of such public utility, in which the value of the property of any public utility or utilities is an issue, the burden of establishing such value shall be upon such public utility or utilities.' (Ill. Rev. Stat. 1953, ch. 111 2/3, par. 30.) Since the legislature has explicitly enumerated the kinds of proceedings in which a utility must prove value, it is a fair inference that no such burden is otherwise imposed. Certainly as a practical matter a utility should not, in the absence of explicit legislative direction, be required to embark upon a full dress justification of its rate structure every time [there is] an individual customer files a complaint. * * *

In our opinion, this argument, like that which appellants addressed to the commission's power to suspend rates, is based on a misconception of the purpose of the Public Utilities Act and of the role of the commission in administering it. The commission is not just an umpire. It has been given active functions of policy making and supervision. It may initiate hearings on its own motion, and it has a wide discretion in shaping proceedings brought by others. The act provides that rates shall be reasonable; but it entrusts the enforcement of that obligation in the first instance to the commission."

In view of the Commission's order in Docket 58907, the Commission's limitation of issues in Docket 59733 was proper and within its discretion.

During the proceeding in Docket 59733, Galesburg sought to discover from Illinois Power information concerning the investment, expense and cost factors in each of the Illinois Power supply areas. The Commission denied Galesburg this information, and Galesburg appealed the ruling to the circuit court. Due to the proper limitation of issues in Docket 59733, as we have noted, the information sought by Galesburg was not relevant to those proceedings, and the Commission properly denied Galesburg's request.

■■ Galesburg also asserts prejudice in certain other evidentiary rulings made by the hearing examiner. It appears that the hearing examiner did not rule on the admission of certain exhibits presented by Illinois Power, but took them with the case for subsequent ruling by the Commission. The Commission's order overruled the objections to the exhibits and admitted the exhibits into evidence. Galesburg argues that this situation, where the evidence to be considered by the Commission is not known until the Commission's final order, unduly prejudiced Galesburg in the preparation of its case. We note that the exhibits objected to contained information of the rates of other utilities within the

State, in order to aid in the assessment of the impact of the proposed rates, and were not substantial significance in the ultimate Commission determination. Rulings made by a hearing examiner are not binding on the Commission. In view of the record, we cannot say that Galesburg was prejudiced by this procedure, so as to justify a remandment or reversal.

■■ Galesburg next argues that the Commission's order in Docket No. 59733 is unreasonable and not supported by sufficient evidence in the record. Section 68 of the Public Utilities Act (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 72) provides in part:

"The findings and conclusions of the Commission on questions of fact shall be held prima facie to be true and as found by the Commission; and * * * [an] order * * * of the Commission shall not be set aside unless it clearly appears that the finding of the Commission was against the manifest weight of the evidence presented to or before the Commission for and against such * * * order * * *, or that the same was without the jurisdiction of the Commission. If it appears that the Commission failed to receive evidence properly proffered, on a hearing or a rehearing, or an application therefor, the court shall remand the case to the Commission with instructions to receive the testimony so proffered and rejected, and to enter a new order based upon the evidence theretofore taken, and such new evidence as it is directed to receive, unless it shall appear that such new evidence would not be controlling, in which case the court shall so find in its order. Rules, regulations, orders or decisions of the Commission shall be held to be prima facie reasonable, and the burden of proof upon all issues raised by the appeal shall be upon the person or corporation appealing from such rules, regulations, orders or decisions."

The Illinois Supreme Court stated, in *Illinois Central R.R. Co. v. Illinois Commerce Com.* (1944), 387 Ill. 256, 275, 56 N.E.2d 432:

"The limitations imposed upon the courts in reviewing orders of the commission are well defined. The law is settled that the matter of rate regulation is essentially legislative. The fixing of rates is not a judicial function. The jurisdiction of the courts to review the orders of the commission, acting under authority delegated to it by the legislature, is limited to the determination of whether or not it acted within the scope of its authority, or whether the order is without substantial foundation in the evidence, or whether a constitutional right of the utility has been infringed upon by fixing rates which are confiscatory or insufficient * * *. [Citations.] If the order of the commission does not contravene any constitutional limitation or rule of law and is within the constitutional and

statutory authority of the commission, and has a substantial basis in the evidence, it cannot be set aside by the courts. [Citations.]" More recently, the Illinois Supreme Court held in *Village of Apple River v. Illinois Commerce Com.* (1960), 18 Ill. 2d 518, 523, 165 N.E.2d 329:

"On review, the circuit court has neither the power nor the duty to conduct a *de novo* hearing, nor does this court, and the wisdom of the decision of the Commission is not open to inquiry. Indeed, it has long been established that in matters relating to services and rates of utilities technical data and expert opinion, as well as complex technological and scientific data, make it essential that the matter be considered by a tribunal that is itself capable of passing upon complex data. [Citation.] The need for the Commission being obvious, it has long been established that the decision of the Commission is entitled to great weight as being the judgment of a tribunal appointed by law and informed by experience. [Citation.]"

As discussed above, the proceedings in Docket No. 59733 were properly limited to consideration of the impact of implementation of common gas rates within Illinois Power's service area. Viewed on the basis of the Public Utilities Act and the record, we are unable to find that the Commission's order was arbitrary, against the manifest weight of the evidence, or in contravention of any established rule of law.

■■ Galesburg additionally argues that the Commission erred in refusing to allow Galesburg to examine an Illinois Power witness concerning Rate 79 revenues. It appears that Galesburg's questions regarding Rate 79 were objected to by Illinois Power, and the objection sustained by the hearing examiner on the ground that Rate 79 was not at issue in the hearing. Galesburg apparently desired to propose the use of Rate 79 revenues to entirely offset increases in rates within Galesburg's supply area. We note, however, that the Commission, in its final order in Docket No. 59733, authorized the use of excess Rate 79 revenues by Illinois Power to offset temporary revenue losses due to the implementation scheme ordered by the Commission. In such circumstance, where the Commission considered the evidence which was offered by Galesburg, we find no substantial error. Ill. Rev. Stat. 1975, ch. 111 2/3, par. 72.

Galesburg finally argues that the ruling of the Circuit Court of Sangamon County, that certain portions of the Commission's order in Docket 58907, relating to proposed *electric rate increases*, were not supported by evidence before the Commission, affects the validity of the Commission's order in Docket No. 59733. We note that Galesburg did not appeal from the Commission's order in Docket No. 58907, and that the

parties who appealed from that order were electric customers who appealed with respect to electric, and not gas, rates. Further, the Circuit Court of Sangamon County did not reverse the Commission's order, but remanded the case for additional proceedings to allow the Commission to set forth its basis for the conclusions as to electric rates objected to. It additionally appears that the Circuit Court's order is currently the subject of a pending appeal before the Fourth District Illinois Appellate Court. Those proceedings are collateral to this appeal, and can have no effect on the merits of Galesburg's position herein.

For the reasons above stated, the judgment of the Circuit Court of Knox County affirming the Commission's order in Docket No. 59733 is, therefore, affirmed.

Affirmed.

STENGEL, P. J., and BARRY, J., concur.