(No. 34627.—

THE CITY OF CHICAGO, Appellant, *vs.* ILLINOIS COMMERCE COMMISSION *et al.,* Appellees.

*Opinion filed May 21, 1958.*

JOHN C. MELANIPHY, Corporation Counsel, of Chicago, (JOSEPH F. GROSSMAN, J. J. DANAHER, and EDWARD V. HANRAHAN, of counsel,) for appellant.

LATHAM CASTLE, Attorney General, of Springfield, (HARRY R. BEGLEY, of counsel,) for appellee Illinois Commerce Commission, and ROSS & O'KEEFE, of Chicago, (CLARENCE H. ROSS, MELVIN A. HARDIES, JOHN M. CONNERY, and JOSEPH H. MUELLER, of counsel,) for appellee The Peoples Gas Light and Coke Company.

Mr. CHIEF JUSTICE DAVIS delivered the opinion of the court:

This case involves an order of the Illinois Commerce Commission, herein called Commission, directing that a cost-of-natural-gas adjustment clause be filed as part of the regular tariffs of Peoples Gas Light and Coke Company, herein called Peoples. The city of Chicago, appellant, took an appeal to the superior court of Cook County, which confirmed the Commission's order, and from that order it brings this direct appeal, under section 69 of the Public Utilities Act. Ill. Rev. Stat. 1957, chap 111⅔, par. 73.

Upon petition of Peoples, the Commission, on December 18, 1956, ordered that Third Revised Sheet No. T-6 be filed in its present schedule of rates, providing for an

automatic adjustment from time to time of its sales price for gas, to reflect changes in the wholesale cost to Peoples of natural gas purchased. In substance, the automatic adjustment or escalator clause provides for increases or decreases in the charges for gas sold by Peoples (except to certain classes of customers) to the extent of increases or decreases in the wholesale price of such gas.

Peoples is a public utility engaged in the business of distributing and selling gas within the city of Chicago. It purchases its entire supply of natural gas from two subsidiaries, Natural Gas Pipeline Company of America, herein called Natural, and Texas Illinois Natural Gas Pipeline Company, herein called Texas Illinois. Peoples owns 100% of the common stock of Natural and approximately 70% of the common stock of Texas Illinois, both of which are natural gas companies under the Natural Gas Act of 1938 and subject to the exclusive jurisdiction of the Federal Power Commission, herein called FPC. (U.S.C., Title 15, secs. 717(c) and (d).) Natural and Texas Illinois either purchase or produce natural gas in the gas fields, transport it by pipe line, and sell it to at least 10 gas distribution companies which resell it to customers. More than 60% of the total natural gas volume of Natural and Texas Illinois is sold to distributors and customers other than Peoples. In 1955 the wholesale cost of natural gas, fixed by the FPC, amounted to approximately 46% of the operating expense of Peoples, and constituted the largest item of such expense.

The city of Chicago contends that the automatic adjustment clause is unnecessary and against the public interest, and that the action of the Commission exceeded its statutory power. The Commission and Peoples claim that the Public Utilities Act permits such an automatic adjustment clause, and that the present order of the Commission is not an abuse of discretion.

We turn first to the question of the power of the Commission to authorize an automatic adjustment clause in a

utility rate schedule. It is conceded that this question is one of first impression in this court, although, as an administrative practice, such automatic adjustment clauses have long been permitted. ( Public Utilities Fortnightly, Nov. 24, 1955, p. 894; Report of Subcommittee on Rate Adjustment Clauses of the American Gas Association, 1956, sec. VI.) The governing statutory provisions are contained in section 36 of the Public Utilities Act, (Ill. Rev. Stat. 1957, chap. 111⅔, par. 36,) which provides the method for any change "in any rate or other charge or classification, or in any rule, regulation, practice or contract relating to or affecting any rate or other charge, classification or service, * * *." The section requires that the utility must file its proposed new schedule with the Commission 30 days before the schedule is to be effective. After the schedule is filed, the Commission shall have the power "either upon complaint or upon its own initiative without complaint, at once, * * * to enter upon a hearing concerning the propriety of such rate or other charge, classification, contract, practice, rule or regulation, and pending the hearing and decision thereon, such rate or other charge, * * * shall not go into effect. * * * All such other rates or other charges, * * * not so suspended shall, on the expiration of thirty days from the time of filing the same with the Commission, or of such lesser time as the Commission may grant, go into effect and be the established and effective rates or other charges, * * * subject to the power of the Commission, after a hearing had on its own motion or upon complaint, as herein provided, to alter or modify the same."

As we said in *Antioch Milling Co.* v. *Public Service Co.* 4 Ill.2d 200, 204: "This language seems clearly to contemplate that the commission shall analyze a proposed rate change, and reach a conclusion as to whether it is to be permitted to go into effect without a formal hearing, or whether it is to be suspended until a formal hearing has

been had. * * * The commission has thus been given authority either to suspend the new rate or let it go into effect, a technique of utility regulation which is not at all uncommon."

The city of Chicago contends that the authorization of the automatic adjustment clause contravenes section 36 and permits changes in rates without the filing of rate schedules and constitutes an abuse of the exercise of the Commission's discretion. We cannot agree. As commonly used, "rate" is defined as a "price or amount stated or fixed on anything with relation to a standard; a fixed ratio; a settled proportion." (Webster's New Twentieth Century Dictionary, 2d ed., p. 1496.) Under the statute, " 'Rate' includes every individual or joint rate, fare, toll, charge, rental or other compensation of any public utility or any two or more such individual or joint rates, fares, tolls, charges, rental or other compensation of any public utility or any schedule or tariff thereof, and any rule, regulation, charge, practice or contract relating thereto." (Ill. Rev. Stat. 1957, chap. 111⅔, par. 10.16.) Under the common, as well as the statutory definition, it is clear that the statutory authority to approve rate schedules embraces more than the authority to approve rates fixed in terms of dollars and cents. The present automatic adjustment clause is a set formula by which the price of natural gas to the ultimate consumer is fixed by inserting in the formula the wholesale price of natural gas as established by the FPC. The Public Utilities Act, taken as a whole, contemplates that a rate schedule may contain provisions which will affect the dollar-and-cents cost of the product sold. Many State public utility commissions, operating under similar statutory provisions, have approved automatic adjustment clauses, as is indicated in the Public Utility Reports (PUR). *Re Worcester Gas Light Co.* (Mass. 1955) 9 PUR 3d 152; *Re New Jersey Natural Gas Co.* (1954) 6 PUR 3d 249; *Re Virginia Electric & Power Co.* (1954)

7 PUR 3d 108; *Re Wisconsin Power & Light Co.* (1955) 9 PUR 3d 422; *Re Washington Gas Light Co.* (D.C. 1954) 4 PUR 3d 105.

At the close of 1954, sixty-five gas distributing companies in twenty-six States had adjustment clauses in their rate schedules based on the cost of purchased gas, and twenty-two companies in twelve States had adjustment clauses based on either cost of purchased gas or fuel to manufacture gas. However, we know of only one case where such a clause has been given judicial scrutiny. In *City of Norfolk* v. *Virginia Electric & Power Co.* 197 Va. 505, 90 S.E.2d 140, the city appealed from an order of the State Corporation Commission authorizing a substantially similar automatic adjustment clause in the rate schedules of gas distribution companies. The statutory authority of the Virginia Commission is, in all material respects, almost identical with that of the Illinois Commission. (Cf. Code of Virginia, 1950, secs. 56—235 to 56—237.) The city of Chicago apparently concedes that this case is squarely in point on the issue of the basic statutory authority of the Commission. Therefore we have carefully considered the holding and rationale of this decision. The city of Norfolk, like the city of Chicago, argued, first, that the Commission transcended the limits of the legislative discretion vested in it, and second, that an automatic increase in the charge to consumers, based on an increase in the wholesale cost of gas, is illegal since there is no provision for a public hearing when each additional increase becomes effective. After analyzing the statutory provisions almost identical to those in Illinois, the Supreme Court of Appeals of Virginia, at 90 S.E.2d 140, pages 148 and 149 stated:

"Hence, the power of the Commission is not limited to the mere change of a particular rate that the public must pay for the service rendered by a public utility, but it has the power to change, under certain conditions, any part of a filed schedule, rate, rule or regulation that in any manner

affects the rates charged or to be charged. The General Assembly has, * * * 'recognized that rate schedules consist not merely of lists of rates in dollars and cents, but that they customarily include provisions that will in various ways affect the rates charged at the time of filing or to be charged thereafter.'

"The proposed escalator clause is nothing more or less than a fixed rule under which future rates to be charged the public are determined. It is simply an addition of a mathematical formula to the filed schedules of the Company under which the rates and charges fluctuate as the wholesale cost of gas to the Company fluctuates. Hence, the resulting rates under the escalator clause are as firmly fixed as if they were stated in terms of money.

\* \* \* \* \*

"The City next contends that the escalator clause results in a denial of procedural due process of law to the consumers because there is no public notice and hearing on each occasion when the actual rate is increased. It also contends that notice of each increase in rates under the escalator clause is required by Code, Sec. 56—237. There is no merit in these contentions.

\* \* \* \* \*

"Code, Sec. 56—237 provides that 'No change shall be made in any schedule filed pursuant to the preceding section' without due notice to the public. The preceding section, 56—236, as heretofore stated, requires every utility to keep on file with the Commission its schedules of rates and as a part of such schedules, 'copies of all rules and regulations that in any manner affect the rates charged or to be charged.' When these two sections of the Code are thus read together, it is clear that notice is not required on each occasion when there is a change in the ratepayers' bills, but that notice is required for every change in the filed schedules which are the underlying basis for the computation of those bills. This requirement gives the ratepayer ample

opportunity to be heard as to the just and reasonable character of the rates charged or to be charged."

We find the foregoing decision in point, and while not binding upon us, its logic is sound and compelling. We conclude that the Public Utilities Act of Illinois vested in the Commission the power to authorize an automatic adjustment clause to be filed in a rate schedule in the proper case.

We must next consider whether, under the facts of this particular case, the authorization of the automatic adjustment clause constituted an abuse of discretion by the Commission. In attacking the action of the Commission, the city of Chicago contends that such a clause is improper where the gas pipeline company, which purchases or produces the natural gas, is a subsidiary of the distributing company. We recognize the subsidiary-parent company relationship between both Natural and Texas Illinois and Peoples, and we agree that such corporate organization warrants regulatory scrutiny of the contracts and dealings between them. (Cf. *Smith* v. *Illinois Bell Telephone Co.* 282 U.S. 133, 75 L. ed. 255, 261.) However, the jurisdiction to regulate the price of gas sold by Natural and Texas Illinois to Peoples is clearly defined. The Natural Gas Act of 1938, (U.S. Code, Title 15, sec. 717 *et seq.*) vested the power to fix rates for natural gas transported and sold to distributing companies in interstate commerce exclusively in the FPC and preempted any right which might have existed in the States to regulate such rates. (*Public Utilities Com.* v. *United Fuel Gas Co.* 317 U.S. 456 87 L. ed. 396; *Citizens Gas Users Ass'n* v. *Public Utilities Com.* 165 Ohio St. 536, 138 N.E.2d 383.) Natural and Texas Illinois must charge and Peoples must pay the FPC determined rate, and the Commission has no power over such rate. Even the city of Chicago, in its brief states: "We do not claim that the rates fixed by the FPC should not be billed and collected by Natural and Texas Illinois from Peoples * * *."

The city does contend, however, that in view of the affiliation of supplier and distributor, the FPC price may not be reasonable and therefore should be subject to disallowance by the Commission as an operating expense of Peoples. There is nothing to suggest, however, that the FPC has not and will not obey the Congressional mandate and closely scrutinize this relationship for the statutory purpose of protecting the public and the consumer against exploitation. (*Federal Power Com.* v. *Hope Natural Gas Co.* 320 U.S. 591, 610, 88 L. ed. 333, 349.) It should also be noted that the FPC will be aided in the setting of rates by the arguments of nonaffiliated customers of Natural and Texas Illinois who purchased 60% of their total volume at the same price charged Peoples, as well as by the city of Chicago and the Commission, which have consistently appeared in such FPC rate cases for the purpose of protecting the consuming public. Even if it were conceded that the Commission may have power to enter into an independent determination of the reasonableness of the FPC rates we see no reason to force it to do so. Congress has given the FPC the duty to protect the consumer against exploitation in this area and the Commission may properly assume that the FPC has performed that duty.

The same claim was made in *Citizens Gas Users Ass'n* v. *Public Utilities Com.* 165 Ohio St. 536, 138 N.E.2d 383. The pipeline company, (Manufacturers) and the distributing company, (Natural) were wholly owned subsidiaries of a single parent company. It was claimed that the Ohio commission, in fixing the rates of Natural, should have considered the reasonableness of the amount charged for gas by Manufacturers. The Ohio Supreme Court stated at page 384: "In determining what is a fair rate of return for Natural, the commission took into consideration the amount it pays for gas purchased from Manufacturers and held that it has no jurisdiction or authority to determine whether that amount is excessive, since Manufacturers is

charging the rates fixed by the Federal Power Commission, and the price so charged is subject to regulation exclusively by the Federal Power Commission, and thus the Public Utilities Commission of Ohio has no authority to interfere with rates established by the Federal Power Commission. This court is in accord with that holding. The power to fix rates for natural gas transported and sold in interstate commerce has been vested by the Natural Gas Act of 1938, Section 717 et seq., Title 15, U.S.C., 15 U.S.C.A. Sec. 717 et seq. in the Federal Power Commission exclusively. *Public Utilities Commission of Ohio* v. *United Fuel Gas Co.* 317 U.S. 456, 63 S. Ct. 369, 87 L. ed. 396."

Since we conclude that the Commission is without power to consider the reasonableness of the FPC rates, we find no abuse in its discretion in determining that the rates fixed by the FPC should be allowed as an operating expense.

We next consider the claim of the city that the automatic adjustment clause is unreasonable or unlawful in that it shifts the burden of proof from the utility to the Commission or consumer. It is true that if the city or a consumer wishes to complain of the unreasonableness of a rate, the burden of proof rests upon the complainant, and that an increase to the consumer by virtue of the automatic adjustment clause would not alter this circumstance. However, this does not amount to any shifting of the burden of proof, but is merely in accord with the consistent rulings in complaint proceedings under the Public Utilities Act. (*Antioch Milling Co.* v. *Public Service Co.* 4 Ill.2d 200, 209; *Moline Consumers Co.* v. *Commerce Com. ex rel. Chicago, Burlington and Quincy Railroad Co.* 353 Ill. 119, 127; *Chicago and Eastern Illinois Railway Co.* v. *Commerce Com. ex rel. Cairo Association of Commerce,* 343 Ill. 117, 124.) It is also clear that in any rate filing, the Commission has the discretion to let a rate go into effect without requiring the utility to bear the burden of proof

in justifying its rate schedule. (*Antioch Milling Co.* v. *Public Service Co.* 4 Ill.2d 200, 208-209.) Section 30 of the Public Utilities Act shows that the legislature has imposed the burden of proof upon the utility "In all proceedings before the Commission, initiated by the Commission upon its own motion, or initiated by an application of such public utility, in which the value of the property of any public utility or utilities is an issue. * * *." (Ill. Rev. Stat. 1957, chap. 111⅔, par. 30.) We have held that no such burden is otherwise imposed. *Antioch Milling Co.* v. *Public Service Co.* 4 Ill.2d 200, 209.

If the Commission, by authorizing the automatic adjustment clause, had given up its right to initiate proceedings to determine the reasonableness of Peoples rates until the utility should file a new schedule of rates, we might agree with the city's position. However, it has not done so. Section 41 of the Public Utilities Act (Ill. Rev. Stat. 1957, chap. 111⅔, par. 41,) authorizes the Commission, at any time, upon its own motion, after a hearing, to investigate the reasonableness of any rate, charge, classification, rule, regulation, contract or practice, or the entire schedule or schedules of rates. Section 36 gives the Commission the power to immediately order a temporary schedule of rates when it is of the opinion and finds that the net income of a public utility is in excess of the amount required for a reasonable return upon the value of its property. (Ill. Rev. Stat. 1957, chap. 111⅔, par. 36.) In all such proceedings the burden of proof would be upon the utility. Ill. Rev. Stat. 1957, chap. 111⅔, par. 30.

It is therefore apparent that the Commission has the power to determine when the utility must meet the burden of proof, regardless of the authorization of the automatic adjustment clause. The clause itself does not shift any burden of proof imposed by the act. We think it appropriate to repeat our answer to a similar argument in *Antioch*

*Milling Co.* v. *Public Service Co.* 4 Ill.2d 200, 210: "In our opinion, this argument, * * * is based on a misconception of the purpose of the Public Utilities Act and of the role of the commission in administering it. The commission is not just an umpire. It has been given active functions of policy making and supervision. It may initiate hearings on its own motion, and it has a wide discretion in shaping proceedings brought by others. The act provides that rates shall be reasonable; but it entrusts the enforcement of that obligation in the first instance to the commission."

Prior to the authorization of the automatic adjustment clause it was the practice of the Commission to allow rate increases based upon an anticipated increase in the cost of natural gas to go into effect without suspension. The city, and one of the members of the Commission, prefer such a practice to the authorization of the automatic adjustment clause. This is a question of preferable techniques in utility regulation which, in the absence of an abuse of discretion, is not within the scope of the judicial process. Under either system, the substantive and procedural rights of the utility, the consumer, and the Commission remain the same. We cannot find that the public or consumer has lost, nor the Commission abandoned, any rights or powers by the authorization of the automatic adjustment clause.

The Commission has advanced compelling arguments in favor of the automatic adjustment clause as an administrative boon. The city urges that the former practice of permitting rate increases to go into effect immediately upon an advance in the wholesale cost of gas accomplished the same result from an administrative point of view. We do not think it necessary to answer this contention. The legislature has vested in the Commission the rate-making function which "involves the making of 'pragmatic adjust-

ments.'" (*Federal Power Com.* v. *Hope Natural Gas Co.* 320 U.S. 591, 602, 88 L. ed. 333, 344; *Federal Power Com.* v. *Natural Gas Pipeline Co.* 315 U.S. 575, 586, 86 L. ed. 1037, 1050.) Since there has been neither loss of substantial rights to the consuming public, nor abandonment of the administrative function, we find no abuse of discretion by the Commission in this pragmatic adjustment.

Aside from the question of its general propriety, the city makes only one complaint against the operation of the automatic adjustment clause; it objects to the exclusion from the operation of the automatic adjustment clause of the established 95 cent minimum charge for the initial three therms of gas consumed per month. It suffices to say that this is a basic minimum charge to cover the negligible cost of gas to the minimal consumer plus the cost of servicing the account. It is patent that such minimum charge is based on the cost of providing the service and has no substantial relation to the cost of gas consumed. It was therefore properly excluded from the operation of the automatic adjustment clause.

We conclude that the Illinois Commerce Commission acted reasonably and within the ambit of its statutory authority. The judgment of the superior court of Cook County confirming the order of the Commission is accordingly affirmed.

*Judgment affirmed.*